Lynda R. BUZZELL and Dale J. Buzzell, Appellants,

v.

E.W. BLISS, Defendant and Third Party Plaintiff, Respondent,

v.

TWIN CITY TOOL COMPANY, INC., Third Party Defendant, Respondent.

Nos. C8–84–529, C0–81–817.

Court of Appeals of Minnesota.

Dec. 4, 1984.

Paul E. Godlewski, Barna, Guzy, Merrill, Hynes & Giancola, Ltd., Minneapolis, for appellants.

James O'Neal, Faegre & Benson, Minneapolis, for E.W. Bliss.

James Haigh, Cousineau, McGuire, Shaugnessy & Anderson, Minneapolis, for Twin City Tool Co.

Heard, considered and decided by WOZNIAK, P.J., and FORSBERG and LESLIE, JJ.

## OPINION

FORSBERG, Judge.

This is a products liability action involving a punch press, manufactured by respondent E.W. Bliss [hereafter Bliss], on which appellant Lynda Buzzell lost parts of two fingers. A safety device had been installed by the employer, respondent Twin City Tool, but was not in use at the time of the accident. The trial court in 1981 granted summary judgment in favor of the manufacturer of the safety device, Safeguard Manufacturing. The jury returned a verdict in favor of Bliss, finding no product defect and apportioning 100% of fault to Buzzell, who appeals from both judgments entered against her. We affirm.

## FACTS

*The accident*

Lynda Buzzell was injured near the end of her first night on the job at Twin City Tool, where she was operating a Bliss 15-ton punch press. She testified that her back began bothering her, she removed the wristlet "pullbacks," and rose from her chair intending to leave the machine for a short break. She then realized that she had left a piece in the machine and reached in to remove it. While reaching in, she slid her foot along the floor and struck the treadle foot which operated the ram of the press. The ram descended and partially amputated her middle fingers.

One of Buzzell's co-workers testified that Buzzell had told her after midnight she was going to work without the pullbacks, and that this was about 5 minutes before the accident.

Buzzell testified that the foot treadle was loose, tilted to one side, and could be activated with a minimal amount of pressure. Bliss maintained that the treadle, as manufactured, could not be activated with less than 30 or 40 pounds of pressure. Their engineer stated that the treadle was six inches off the floor. Buzzell testified that the treadle, which was guarded by a plate above and to one side of the pedal, was two inches off the floor. The leadman and foreman stated that the treadle would have been repaired had it been in that condition.

*Punch press safety*

The Bliss press involved in Buzzell's accident was manufactured in 1943. Evidence at trial established that the technology was fairly stable, this particular machine having been first designed in 1907, and that punch presses could remain in use as long as 50 years.

The "point of operation" in a punch press is that area where the force of the descending ram is delivered, by means of the die inserted by the user, to the object to be formed. In a multi-use press, such as the one involved here, there are thousands of operations that can be performed depending on the die inserted. Bliss' argument is that until the die is chosen by the user and inserted in the machine, there is no "point of operation," to be guarded, and therefore no duty on the part of the manufacturer to provide such a guard. Specifically, there is no guard which the manufacturer could install which would not interfere with some operations a user might wish to perform.

It was agreed by all experts at trial that the standard in the industry in the United States is that the manufacturer leaves any point-of-operation protection to the user. Such protection, as discussed at trial, fell into two categories:

1) guards, usually "barrier" guards interlocking with the machine, to prevent insertion of an operator's hands at the wrong time; and

2) safety devices, such as the "pullback" wristlets installed by Twin City Tool and manufactured by Safeguard.

Appellant's theory was that an interlocking barrier guard, which it was generally agreed was an available technology in 1943, should have been installed by Bliss. One of her experts, Lanny Berke, a mechanical engineer, presented a diagram of such a guard, designed for trial, which he claimed would allow for the vast majority of operations a user would wish to perform. Her other expert, James McCarthy, an industry safety consultant, stated that although a barrier guard "would greatly limit the uses of a specific die," it could fit 95% of the operations desired.

Bliss' defense was that the interlocking barrier guard interfered with too many potential operations, could be defeated by the user, was not feasible and should not be required of a manufacturer.

*Trial court rulings*

The trial court, in June, 1981, ordered summary judgment for Safeguard on the grounds that, since it was undisputed that Buzzell was not wearing the wristlets at the time of the accident, any defect in the wristlets could not have caused her injury. Prior to trial, Buzzell signed a stipulation for the dismissal of all claims against Safeguard.

In chambers before trial, the court made three evidentiary rulings. First, it ruled that evidence of the presence and non-use of the wristlet "pullbacks" was admissible. Buzzell's position was that such evidence should be excluded because of the summary judgment order finding that the wristlets played no causal role in the accident.

The trial court also ruled that evidence of other accidents involving treadle-operated presses with no point-of-operation guard would not be admissible. Buzzell contended they were relevant to show design defect as well as notice. Bliss argued that there was no showing of sufficient similarity in time, place or circumstances. All of these accidents occurred after 1943, the year of manufacture of the punch press.

Finally, the court ruled that evidence as to Bliss' practices in England with respect to guarding would be excluded. Bliss argued that since English statutory law placed primary responsibility for guarding on the manufacturer, requiring the prospective user to inform the manufacturer of the uses of the press so an appropriate guard could be installed at the factory, this evidence was irrelevant, and potentially confusing to the jury. Buzzell claimed it was relevant to the issues of feasibility and notice.

The trial court later ruled that McCarthy, a safety consultant with experience advising machine users of safety features, but no experience advising manufacturers, could not give an opinion as to the safety of the design of the Bliss press.

The court also ruled that testimony of Buzzell's economist, Dr. Evenson, as to her loss of capacity as a homemaker, would be excluded. The court noted that she had worked as a homemaker for the last 5 years since the accident and had not had to hire anyone to perform any of those services.

The special verdict returned by the jury, after finding no product defect and apportioning 100% of fault to Buzzell, assessed her damages at zero. The parties, however, had agreed to medical expenses of $1,647.25, which had been presented to the jury. The jury was re-instructed as to its duty to enter a sum for damages, and returned with the same verdict on liability, but with the stipulated sum as damages.

## ISSUES

1. Did the trial court err in granting summary judgment to Safeguard?

2. Did the trial court err in excluding evidence of Bliss' installation of safety guards in England because of the different duty imposed by English law?

3. Did the court err in excluding evidence of similar accidents?

4. Did the court err in failing to exclude evidence of the presence and use of the wristlet "pullback" device?

5. a. Did the court err in excluding certain evidence of Buzzell's damages?

b. Did the jury's failure to find even stipulated damages, after attributing no fault to Bliss, evidence such passion and prejudice as to require a new trial?

## ANALYSIS

### 1. *Safeguard summary judgment*

■ Summary judgment for Safeguard was ordered in June, 1981. Discovery up to that time indicated that the wristlet "pullbacks" had been sold to Twin City Tool by an L.L. Cook Company, not a defendant in the lawsuit. Safeguard argued, and the court agreed, that the wristlets were selected by Twin City Tool in reliance on Cook, a company which was independent of Safeguard. Thus, not only were the wristlets not an actual factor in the accident, but their choice, which may have prevented installation of a better safety device, was not attributable to Safeguard. Cook was never added as a defendant.

Buzzell argued, at the hearing on the motion for summary judgment, that the wristlets were a "trap for the unwary," and should not have been put on the market. She also claimed that the motion was premature since discovery was incomplete, and that Safeguard had a duty to warn an operator of dangers following removal of the wristlets.

Liability has been found against manufacturers of safety devices and protective clothing. *See,* Annot., 27 ALR 4th 815 (1984), cases cited. Few of these cases deal with safety devices incorporated into other equipment, such as the wristlet "pullbacks" here; none appear to involve safety clothing or equipment not in use at the time of the accident. *Id.*

■ In order for strict liability to be established, the defective condition of the product must be shown to be the proximate cause of the injury. *Waite v. American Creosote Works, Inc.,* 295 Minn. 288, 204 N.W.2d 410 (1973). Since Buzzell was not wearing the "wristlet" pullback device at the time of the accident, she could not establish a claim against Safeguard. Summary judgment, therefore, was properly granted.

### 2. *Bliss-England evidence*

■ English law places primary responsibility for operator protection on the manufacturer of the machine. The parties agree that in England a point-of-operation guard on a punch press is required and would be installed either by the manufacturer after receiving notice from the user of the dies to be used with the press, or by the user after providing a waiver to the manufacturer.

Despite the difference in English law, Buzzell urged admission of this evidence to show notice of the hazard and feasibility of an alternative design. Buzzell also sought to introduce a picture of an interlocking guard in a Bliss-England catalogue, claiming that it was similar to that suggested by her expert witness. Here, the issue was feasibility alone.

Bliss admitted knowledge of the hazard from an unguarded point of operation, as well as the availability of point-of-operation guards in 1943. Bliss did not dispute the feasibility of such a guard in itself, but rather the feasibility of its installation by the manufacturer of a multi-purpose press without knowledge of the uses to be made of the press. The English system eliminated this problem; therefore, the probative value of the Bliss-England evidence was weakened.

■ The trial court had discretion to exclude this evidence, even if probative to some degree, if its probative value was outweighed by its potential to confuse or mislead the jury. Minn.R.Evid. 403; *Rose v. Koch,* 278 Minn. 235, 249, 154 N.W.2d 409, 420 (1967). We find no abuse of discretion in excluding this evidence.

### 3. *Evidence of other accidents*

In discovery, Bliss provided reports of 168 accidents, since 1951, involving a multipurpose punch press with a foot treadle and unguarded point of operation. Buzzell offered this evidence at trial to show Bliss'

knowledge of the dangerousness of its punch press, and the defect of its design.

■ Evidence of other accidents, or verified complaints, is admissible to show notice or defect in design. *See, e.g., Independent School Dist. No. 181 v. Celotex Corp.*, 309 Minn. 310, 244 N.W.2d 264 (1976). Such evidence should, however, be relevant to a genuine issue in the case, or its probative value may be outweighed by its prejudicial effect or tendency to mislead the jury. Thus, in *Celotex*, the complaints of moisture problems received by the manufacturer of the roofing material were relevant to the primary issue of who was responsible for the moisture problem in plaintiff's roof.

■ Here, the evidence of other accidents missed the main issue of who, between the user and the manufacturer, was responsible for operator protection. Bliss admitted knowledge that the punch press was a dangerous machine. Other-accident evidence was not relevant to the issue of manufacturer or user responsibility, and was inherently prejudicial, since it graphically demonstrated notice to the manufacturer of serious injuries without showing similar notice to employers and users of the machines. Exclusion of this evidence was within the discretion of the trial court. *See, Rose v. Koch.*

### 4. *Admission of wristlet evidence*

■ The trial court denied Buzzell's motion to exclude all evidence of the wristlets, including the fact that she was not wearing them. The motion was based on the earlier determination, in the Safeguard summary judgment order, that the wristlets had played no causal role in the accident. The wristlets' deficiencies, and their non-use, however, are entirely separate potential causes of such an accident. The exclusion of one as a cause does not require the exclusion of the other. Use of the wristlets may have prevented the accident, and was, therefore, relevant to the issue of contributory fault, and evidence of their non-use was properly admitted.

### 5. *Damages issues*

■ The rule established in Minnesota is that if a jury has determined that there are no grounds for liability, and there is evidence to support this finding, the failure of the jury to properly assess damages will not impeach the verdict. *Wefel v. Norman*, 296 Minn. 506, 207 N.W.2d 340 (1973). As the Court stated in *Wefel:*

It is clear that the jury realized that their findings on liability rendered the damage question moot.

*Id.* at 507, 207 N.W.2d at 341. By the same token, the trial court's evidentiary rulings as to damages issues, if erroneous, must be considered harmless error. *See Duck v. Modern Roadways, Inc.*, 253 N.W.2d 822 (Minn.1977).

### DECISION

Summary judgment was properly granted on behalf of the manufacturer of the wristlets. The trial court's evidentiary rulings were not erroneous, and the jury's verdict in favor of the press manufacturer was supported by the evidence. Any error as to the issue of damages was harmless error.

Affirmed.